Superior Court of Cincinnati.
Special Term, 1900.

FRANKLIN BANK v. THE CITY OF CINCINNATI et al.

1. In an action on a contract against a municipal corporation and its contractors by an assignee of the contract, where the city has filed an affidavit under Sec. 5016, R. S., averring that the subject of the action was money in its hands and praying that the claimants named therein may interplead and be ordered to settle their claims among themselves, and an order made for the deposit of the money in court and requiring such claimants to appear before the court on a day named and maintain their claims to such money, a demurrer will not lie to the original petition, by one of such claimants, on the ground that it does not state facts sufficient to constitute a cause of action against him, nor entitle plaintiff to the relief sought against him, nor to require him to interplead to the petition.

2. A petition in such action alleging a contract between the city and the defendant contractors for the construction of a sewer, the assessment and transfer thereof by such contractors to plaintiff for a valid consideration therein named, the completion of such contract by the contractors, the acceptance thereof by the city, a final estimate issued by the city engineer as the amount still due thereunder from the city, a certain payment made thereon, a refusal to pay the balance or any further sum, the amount still due to plaintiff, which the city refuses to pay, and praying judgment therefor, states a cause of action against the city.

3. Where a party is ordered by the court to interplead in an action, and the subject of the action is not claimed by him, his proper course is to answer, disclaim, or not to plead at all, and is not by a motion to modify the entry of the order of interpleader.

4. Where plaintiff alleges in his petition the whole amount due on a contract, and prays judgment for a part of it, and there are conflicting claims to the whole amount due, the defendant may under Sec. 5016, R. S., pay such amount into court, and obtain an order requiring the claimants to interplead in the action and set up their different claims thereto.

5. The delivery contemplated by the mechanics' lien law is such a delivery as vests in the head contractor the lien or ownership of the materials for which a lien or claim to priority is sought.

6. Under a contract by a sub-contractor with a sewer contractor to furnish the latter with what brick he may need for the construction of a certain sewer, such brick to be acceptable to the engineer in charge of the work, the brick to be counted as delivered and any culls deducted in final settlement, the delivery of the brick does not take place, within the meaning of the mechanics' lien law until the last lot has been inspected and approved or rejected by such engineer.

7. A sub-contractor cannot claim a lien on the amount due a sewer contractor from a municipal corporation for the construction of a sewer, when the last item furnished was not furnished for nor used in the construction of such sewer, and the other items were furnished more than ninety days from the time the affidavits and notices required by the mechanics' lien law to be filed, although the last item was furnished within such time.

8. Where under a contract between a sub-contractor and a sewer contractor to furnish the latter with a certain quantity of brick to be used in the construction of a certain sewer, the sewer contractor, without the consent of the sub-contractor, diverts a portion of the brick so furnished to the construction of another sewer, the sub-contractor is entitled to a lien for all of the brick furnished on the amount due the sewer contractor under his contract with a municipal corporation for the construction of the sewer for which the brick was furnished, although such sub-contractor, after the brick had passed from his possession, knew that a portion of it was being diverted.

9. In Sec. 3203, R. S., (mechanics' lien law) providing that an assignment by a head contractor of his contract shall be subject to the claims of laborers, mechanics, sub-contractors or material men "who has furnished any labor, material," etc., the words "who *has* furnished" were not intended to fix qualifications of time with reference to such assignments, or to limit the class of protected persons, but were intended to preclude all assignments by the head contractor of his contract, irrespective of the nature of the assignments, or of the time when made, with reference to the work and labor performed by laborers or materials furnished, by material men.

10. Under such section the rights of the assignee under an assignment, by a sewer contractor with a municipal corporation, of his contract to a bank, in consideration of advances made and to be made to him by such bank, which assignment was filed with the city board of administration, on the date of its execution, when the contractor went on and completed the contract, are subject to the claims of laborers, material men and sub-contractors, who have not had actual notice of such assignment and who have perfected their liens in conformity to law, on the money in the hands of the city, due on the contract, although such labor was performed and such materials furnished after the assignment was made and filed.

DEMPSEY, J.

Plaintiff filed his petition in this case originally against the city of Cincinnati and McCarron and Dawson, a firm, alone, wherein it averred that on January 11, 1898, the said city entered into a contract with said firm for the construction of the Bloody Run sewer; and that on February 21, 1898, said firm assigned and transferred to said plaintiff all their right title and interest in said contract in consideration of which plaintiff was to make certain advancements to said McCarron and Dawson; that said McCarron and Dawson have completed said contract and the same has been accepted by the said defendant, the city of Cincinnati, and a final estimate issued by the engineer of said city of $11,185.89, as the amount still due under said contract; that on April 21, 1889, said city paid plaintiff the sum of $2,625.57, but refused to pay the balance of said estimate or any further sum to plaintiff; that there is still due to plaintiff from said city the sum of $4,694.03, which said city refuses to pay, and for which said plaintiff prays judgment with interest from April 20, 1899.

The city of Cincinnati, through its corporation counsel, filed an affidavit in this case under section 5016, Revised Statutes, wherein it averred that the subject of the action was money in its hands, and that without collusion with the defendants, McCarron and Dawson, the other defendants make a claim upon said fund, and such other averments as are required by said section, and then prays that said claimants may interplead and settle their claims among themselves.

Thereupon an order was made that upon payment by said city of the sum of $8,560.32, the amount claimed in the petition to be still due from the city to the plaintiff and the other claimants to the fund, within twenty days

from the date of the order, the said city should be discharged from liability to either the plaintiffs, McCarron and Dawson, or any of the other parties, in respect to said sum so paid. It was also ordered that a copy of the order be served on all of the averred claimants, requiring them to appear before this court on or before July 1, 1899, and maintain whatever claim they may have to said money, or relinquish the same .          ,

It will be observed that the order does not specially designate that this money shall be paid into court; evidently an omission in drafting the same, for on June 19, 1899, a second order was made reciting that said city had paid to the clerk of this court said sum of $8,560.32, in accordance with the former order and discharging it from all and future liability to the parties in regard thereto.

All of the alleged claimants answered except the firm of McCarron and Dawson.

Previous, however, to filing an answer, the defendant, George H. Bruns, filed a motion herein and two demurrers, which, by consent of counsel, are to be disposed of before considering the case on the facts.

One demurrer is to the petition of the plaintiff, for the reason that it does not state facts sufficient to constitute a cause of action against him; nor entitle it to the relief sought and prayed for against him; nor to require him to interplead to the petition.

Of course this demurrer must be overruled, for the petition was not framed against this defendant at all, nor is any relief prayed by it against him; nor does nor did plaintiff ask this defendant to interplead. Plaintiff's action was a simple action at law, which, involuntarily on its part, and by the action of the city of Cincinnati, was converted into an equitable action, where all parties are actors and all parties defendants; and where each is asking the enforcement of rights in a common fund.

The second demurrer is to the petition also, on the ground that it does not state facts sufficient to constitute a cause of action against the city of Cincinnati nor this defendant, nor any right to recover any part of said fund, upon which this defendant (Bruns) levied his mechanic's lien.

Waiving the question whether this defendant has any right to test the sufficiency of the petition against the city, it is sufficient to say that it does state a cause of action agaist the city. There is nothing in the petition which shows any claim against this defendant, to the fund in controversy, and of course, in the absence of such averments, on demurrer, the court has nothing to pass upon, but must overrule the same and leave the question to be settled upon future pleadings and the evidence.

The motioin filed is to set aside or modify the entry of the order of interpleader and six reasons are assigned. The first is because the subject of the plaintiff's action is not claimed by Bruns. The proper way to set that up is by answer, or disclaimer, or failure to plead at all. The order may be made by the court on the affidavit of the principal debtor, the one holding the fund, and it is not for any alleged claimant to question that order.

The second ground is because the entire amount of plaintiff's claim is $4,694.03, which is the entire value of the subject of this action, and therefore the city could not ask for interpleader for a sum greater than plaintiff's claim, viz: $4,694.03.

The language of the statute is that if the defendant makes affidavit that, "a third party * * * has or makes a claim, to the subject of the action, etc.," the subject of the action is not necessarily the specific amount sought to be recovered by the plaintiff; it is in reality the amount that is due on the contract itself, a part of which amount plaintiff claims himself. Plaintiff alleges the whole amount due, and prays a judgment for part of it. We see no reason, where there are conflicting claims to the whole amount due, which render it unsafe for the party liable to determine whom to pay, why he may not avail himself of the provision of this statute even though plaintiff claims a part only.          

The third, fourth and fifth grounds of the motion being confined to allegations of inadvertence on the part of the court in making the order, and in releasing the city from liability, it may be said. inasmuch as I made the order, that they were all made in accordance with the statute and upon the evidence that the statute authorized.          

The sixth ground is really a motion to order the clerk to repay the money to the city. The motion in general is overruled, for want of legal merit on all of the grounds alleged. As was stated before, Bruns filed an answer and cross-petition which, with the evidence thereon, was to be considered in case the demurrer and

motion was overruled. A special reply was filed to the answer and cross-petition of Bruns; and one single reply, with several counts, to the answers and cross-petitions of the other claimants. It will not be necessary to set forth these pleadings at length, as the facts necessary to the decision of this case will sufficiently appear in the conclusions on the evidence made herein.

From the evidence it appears that the said firm, McCarron and Dawson, did, on January 21, 1898, contract with said city for the construction of said sewer, that they completed said contract, and that at the beginning of this action there was the sum of $8,461.32 still unpaid by said city on said contract. The petition in this case was filed April 26, 1899. In order to carry on this work it wa snecessary for McCarron and Dawson to have money, and in order to procure the same they entered into an agreement with the plaintiff to furnish it, and, to secure such advances as might be made, executed and delivered to plaintiff the following instrument in writing on the date specified therein, viz:

"In consideration of certain advances to us made by the Franklin Bank we hereby transfer and assign to the said bank as collateral security all of our right, title and interest in the contract entered into by us with the city of Cincinnati on January 17, 1898, for the building of what is known as the Bloody Run sewer.

In witness whereof we have hereunto subscribed our names, this 28 February, 1898.

McCarron & Dawson,
Frank McCarron,
Wm. C. Dawson.

This instrument was filed with the board of administration of the city of Cincinnati on the day of its date. At the time of the execution, delivery and filing aforesaid of this instrument, none of the other interpleaded defendants herein had furnished any material to McCarron and Dawson, or were entitled to any claim on any funds that might have been due to said firm under their said contract.

In pursuance of this agreement or assignment, the said bank advanced, from time to time, money to said firm of McCarron and Dawson, and McCarron and Dawson in turn made various payments to the bank, among which payments are included all of the partial estimates allowed by the city of Cincinnati as the work progressed, and which on April 8, 1899, aggregated $24,058.44. The total cost of the work was to be $36,199.84; from this was to be deducted the amount paid by the city for advertising and inspection, the sum of $955.50, leaving the net cost of the work $35,244.33. Deducted from this the estimates allowed to that time and collected by the bank under its said assignment, and there still remained due on this contract the sum of $11,185.89. By this date, April 8, 1899, all of the interpleaded defendants herein had filed notices and claims to this balance, under the mechanics' lien law, which claims amounted to the sum of $7,782.11. To this amount the corporation counsel added ten per cent. to cover probable costs, etc., making a sum total of $8,560.33, which, under agreement with the bank, was retained by the city of Cincinnati to await the result of the litigation between the bank and the claimants; and the balance, $2,625.57, was paid over to the bank, under its said assignment. This makes in all paid to the bank under this contract the sum of $26,584.01. The bank claims to have advanced some $37,000.00 to McCarron and Dawson; whether all on this contract or on a neighboring contract, does not clearly appear form the evidence in this case. The bank, however, sues for only $4,693.03 and interest, thus showing that payment on the advances made by the bank were also made by McCarron and Dawson from other sources than the estimates allowed on this contract. Although the assignment of the contract, recited above, was filed with the board of administration on the day of its execution, the evidence is conclusive that the firm of McCarron and Dawson never relinquished nor divested themselves of the actual and active prosecution and execution of the work provided for in the contract, and that no actual express notice was ever given or reveived by the impleaded defendants herein that said original contract had been assigned by them for any purpose whatever. It is clear to the mind of the court that none of these defendants had any actual knowledge of this assignments.

The defendant, John Mueller, had a contract partly oral, partly written, with said McCarron and Dawson, whereby and whereunder, on April 11, 1898, he began to supply said firm with sewer pipe, sewer slants and cement, to be used in the construction of said sewer; and which supplies were completed on January 19, 1899; and on which last day, therefore, payment became due; on said last day there was a balance owing to this defendant of

$1,367.56. On January 25, 1899, Mueller filed with the city his sworn and itemized account and value of said materials pursuant to the mechanics' lien statute and filed a copy thereof with the recorder of Hamilton county, Ohio, and also a copy with McCarron and Dawson. The account was not disputed by McCarron and Dawson within the ten days provided by the statute. So that it follows, were there no other questions in the case, that this defendant would be entitled to be paid out of the subsequent payments that were to be made to said McCarron and Dawson under said contract.

The defendant Kemp had an oral agreement with said contracting firm to furnish sand, under which contract he began to deliver sand on April 1, 1898, and completed the same on January 22, 1899, on which day there was a balance due him of $342.80. On March 8, 1899, this defendant filed with said firm, said city and the recorder of Hamilton county, Ohio, the various notices and affidavits required by law; and the account being undisputed for ten days, he has, no other question intervening, acquired a right to be paid out of the subsequent payments to become due to said contracting firm.

As to the defendant, T. F. McClure, the conclusion the court reaches on the facts are these: On February 11, 1898, McCarron and Dawson entered into a contract with McClure and McManigal, a firm, whereby said last named firm was to sell and deliver all of the vitrified sewer brick to be used in the construction of said sewer, for which McCarron and Dawson were to pay the sum of $9.50 per thousand; that thereafter McManigal assigned and transferred to T. F. McClure, the defendant herein, and who was the other member of the firm of McClure and McManigal, all of his interest in said contract for the vitrified brick, and all his right to any money arising thereunder, the said McClure to perform the terms of said contract as if the same had been made by him; all of which was accepted by McCarron and Dawson. This contract was as follows:

"We hereby propose to furnish you with what vitrified sewer brick you may need for the construction of Bloody Run sewer at $9.50 per thousand, delivered along the line of the work. Brick to be acceptable to the engineer in charge of the work, you to pay the freight and wharfage as the brick are delivered and 75 per cent. of the balance per month on estimate for what brick are used and also any estimate that may be received for brick on hand, balance to be paid when final estimate is received; brick to be counted as delivered and any culls deducted in final settlement."

Under this contract the brick were brought to this city by rail and barge between the first of April and the first of August, 1898, and were hauled out along the line of the work and piled up. The contractors resorted to the piles as brick were needed, using the last from the piles on January 19, 1899. On April 19, 1899, McClure was notified by the contractors that there were 2,280 brick, which were returned to him unused and as still belonging to him. The amount of brick claimed to be delivered under the contract was 373,528, for which, after deducting cash credits, and a credit for the 2,2280 unused brick, there is due to McClure the sum of $793.69, which he claims with interest from March 1, 1899. On said March 1, 1899, McClure filed with the city and with McCarron and Dawson, and with the recorder of Hamilton county, the various notices and accounts required by law, and, ten days having elapsed without objection, he claims the right of payment out of the future payments due to McCarron and Dawson.

His right to participation, not noticing now any other question, is denied on the ground that the completion of his delivery of brick under his contract was made August 16, 1898; hence his notices and affidavits were not filed within either sixty or ninety days after said *completion of delivery; that is, under either* the old or the new mechanics' lien law, the new one being the one lately declared unconstitutional.

McClure's contention is that his delivery *was not completed until January 19, 1899, the* day the last brick were used by the contractors. The determination of the question depends on the proper construction of the contract between McCarron and Dawson, and McClure and McManigal, as read in the light of all surrounding circumstances. The structure into which the brick were to be placed was of some considerable length; the time in which it was to be completed was uncertain; the quantity of brick to be used could not be fixed in advance because of the nature and length of the work; it was to the convenience and advantage of the builders, and they so stipulated, that the brick should be delivered along the line of work; the quality of the brick was to be the acceptance of the chief engineer of the city in charge of the work.

Now, while the word "delivered" is used in this contract, it does not seem to me, when interpreted in connection with the foregoing circumstances, that it is entitled to the full significance of intending a change or transfer of title and ownership at the moment any quantity of the brick were placed along the line of the work. The condition that the brick must be

acceptable to the engineer in charge negatives any such construction as that. Delivery, in its legal significance, comprehends two notions; a tender of the goods on the part of the vendor, and an acceptance on the part of the vendee. When these two acts concur, title is transferred. Now, while in an ordinary contract of sale, acceptance on the part of the vendee may in effect be compelled by suit to recover the contract price, after tender of the article sold (*Shawhan* v. *Van Nest*, 25 Ohio St., 490, 498; *Cullen* v. *Bimm*, 37 Ohio St., 236, 238), I do not see how this can be effected when there is a condition intermediate between the tender and the time for acceptance, and which must be complied with before the vendee can be even asked to accept. The delivery contemplated by the mechanics' lien law, is such a delivery as vests in the head contractor the title or ownership of the materials for which a lien or claim to priority is sought. Judge Holmes, in his notes Y to Z, star page 492 of 2 Kent's Commentaries, 13 Ed., says that the legal requirements to the passing of title are: "(1) That the chattels shall exist and be owned by the seller, at the time when the title is to pass; (2) that they shall be specified; (3) that there shall be a mutual assent of buyer and seller to the passing of the title to the chattels so specified. The assent must in legal contemplation exist when the title is to pass. * * * So the passing of the title may be the subject of condition; in the case of unspecified goods no title can pass until there as an identification, and an assent of both parties to the passing of the title to the goods as identified."

The case at bar is a case of unspecified goods; the identification required was the inspection and approval of the city's inspecting engineer; until that was had no title passed in the brick to McCarron and Dawson and hence there was no completed delivery until such approval. The delivery along the line of the road was a simple tender by McClure, which was not accepted or active until the engineer had performed his duty. The evidence shows that the engineer inspected and decided as the work progressed, hence final delivery was not accomplished until final inspection, which the evidence shows was January 19, 1899. Hence the court holds that delivery by McClure was not completed until that date, and his affidavit and notices were consequently filed in time to intercept any future payment to McCarron and Dawson.

As to the claim of L. Jones & Co., the evidence shows they had a running account with McCarron and Dawson; that they furnished certain iron castings during September and October, 1898, which were used in the Bloody Run sewer, the last of these items being of date October 25, 1898; that at this time and subsequently McCarron and Dawson were also engaged in the construction of what is known as the Observatory road improvement, and that on January 5, 1899, Jones & Co., at the request of McCarron and Dawson, given by telephone, furnished to them a large iron casting or steel plate to be used somewhere not precisely located by the evidence. These defendants claim $98.00 as the balance due on said account. On March 6, 1899, they filed with the city and McCarron and Dawson and the recorder of Hamilton county, the various affidavits and notices required, and, ten days having elapsed without objecting, they claim a lien for the $98.00.

The evidence I think conclusively shows that the plate ordered January 5, 1899, could not by any possibility be needed, or be of any use or value in the construction of Bloody Run sewer, but could be of use on Observatory road; and the evidence tends to show that such a plate was used in the covering of a well hole in the vicinity of property belonging to John L. Stettinius. The evidence certainly satisfies the court, that the plate was not furnished for the Bloody Run sewer and therefore is not entitled to be charged against it. Eliminating this item from the account, and the last item of the account stands as of October 25, 1898, with the affidavit and notices of date March 6, 1899, a period of more than sixty or ninety days, whichever limitation be accepted as proper, and these defendants necessarily fail to secure any right to this fund under the statute.

George H. Bruns' claim is for common brick furnished in the construction of this sewer, under a contract on which is due the sum of $5,158.06, with interest on $2,384.50, from January 29, 1898, and on $2,773.50, from April 8, 1899. His contract was completed in January, 1899, and on the twenty-fifth of that month and year, he took the necessary steps to secure his claim. The contract price was $6.00 per thousand. The objection made to this claim is that 55,000 of the brick claimed to be furnished under this contract were in reality used by McCarron and Dawson in a second sewer, known as the Rockdale Avenue sewer. This is testified to positively by McCarron and Dawson and not denied (page 104, record). Bruns himself testifies that he knew when McCarron and Dawson built the Rockdale Avenue sewer and that they took some of his brick to build it with, the quantity he did not know, and that the brick taken for that purpose were included in the lien taken on the

Bloody Run sewer funds. He says he didn't furnish the brick on the work, but on the cars; that McCarron and Dawson hauled the brick and he supposed they could haul them where they saw fit. The work was estimated to require 1,900,000 brick and he furnished 1,849,000. He took a lien for that amount, although some of them he knew went into Rockdale Avenue sewer. He had no contract to furnish brick for the Rockdale Avenue sewer. Dawson sent him word once to ship faster and Bruns went down to the work and saw him, and said to him: "Dawson, you have a lot of brick up there on the street, why don't you haul them down where you need them?" Dawson said he would use them up there on Rockdale Avenue; Bruns did not object to that nor did he find any fault with him, although he knew these were his brick; never spoke to McCarron about it. He knew they did use these brick, but he did not know when they were going to use them. He learned it when he first saw them piled along the work.

This is the substance of the evidence on the point. It is an admitted fact that 55.000 of these brick went into Rockdale Avenue sewer and that Bruns knew they were going into it, but the brick had passed out of his control and possession then; and it is questionable, to say the least, what he could have done to prevent it. The approximate number required in Bloody Run sewer was 1,900,000, and there is no evidence that Bruns was acting in other than good faith while he was engaged in delivering under this contract.

The question arose in *Beckel* v. *Petticrew*. 6 Ohio St., 247, between an owner and a material man directly furnishing the material, and it was held that what is now section 3184, Revised Statutes, extends a lien on all material in good faith furnished for the erecting cr repairing of a house, etc., * * * notwithstanding a part of the material may subsequently be otherwise appropriated without the consent to the party furnishing it. In *Esslinger* v. *Huber,* 22 Wisc., 63, and in *Bender* v. *Stettinus,* 19 W. L. B., 163, decided by Judge Taft, it was queried how far the rule laid down in *Beckel* v. *Petticrew, supra,* was applicable as between material men, the material of one of whom was used while another's was diverted. The contention of the plaintiff herein, is that Bruns consented to the diversion, and that constituted a new and independent contract for this 55,000 brick.

I am unable to accede to that view of the case, for I don't think the evidence justifies it. As to whether there is any superior equity in the bank to entitle it to call for an abatement of Bruns' claim under this lien, I am also unable

to see that. In the absence of the statute Bruns would have no greater claim than any one else on this fund. The material wording of section 3193, Revised Statutes, which protects the right of sub-contractors and sub-material men, is substantially the same as section 3184, Revised Statutes, and would confer what we designate a sub-contractor's lien upon a material man who had in good faith furnished material, although the same was subsequently diverted by the head contractor. And I know of nothing outside of fraud or collusion or bad faith, or something of that nature, that would postpone him. This lien being of statutory origin, a compliance with the statutory formalities vests the lien in those who are within the pale of the statute's protection; and our Supreme Court has defined those persons.

Bruns, as I read the evidence, falls within the privileged class and is entitled to be protected out of the fund to the full extent of the brick furnished by him, and without any abatement for the 55,000 brick deflected to Rockdale Avenue sewer. I confess I come to this conclusion with reluctance and much hesitation, for it does in some respects seem unjust and often may result inequitably, but it seems to me the remedy lies with the legislature.

Overshadowing, however, the claim of all these lienholders, is the contention of the bank, that its assignment of February, 1898, takes precedence over all of them. In this I am unable to agree with counsel. There is no question that under the act of 1843, S. & C. 833, this claim on the part of the bank would be sound, for the decision in *Copeland* v. *Manton,* 22 Ohio St., 398, decided in 1872, is to that effect; it having been held in that case that a sub-contractor, by the service of the notice provided in said act, was subrogated only to the rights of the contractor; and where whatever was due to the contractor had been in good faith previously assigned by him to another sub-contractor, the assignment was not defeated by the service of such notice; and where, in a suit between all the parties interested, the amount due on the contract by the owner is brought into court, the assignee is entitled to have the same adjudged to him. And this, under statutes of like character with this act of 1843, was the uniform holding of the courts, it having been held in New Jersey, even as late as 1892, in *Board of Education* v. *Duparquet,* 50 N. J. Eq., 234, that an assignment by the contractor not only of monies due, but of monies to become due, if founded on a valuable consideration, was good as against the sub-contractor or material man. See *Boisot on Mechanics' Liens,* section

[copyright, 1901, by carl g. jahn.]

346-347. That was the rule in New York, as, early as 1850, the only exception allowed being that sub-contractors and material men were permitted to assert their claims and stop the funds due on the contract as against an assignment, by the contractor for the benefit of his creditors. *Mandeville* v. *Reid,* 13 Abb., 173 (1850) ; *Otis* v. *Haley,* 1 Daley, 338 (1863) ; *Smith* v. *Bailey,* 8 Daley, 128 (1878).

In May, 1863, the law in New York was amended, whereby it was provided that "no transfer or assignment of his interest in the contract by the contractor should be valid as against parties entitled to file liens under said contract against said contractor ;" and in *Develin* v. *Mack,* 2 Daly, 94, it was held under this amendment, that as the contractor's engagements are based upon the amount of his contract, his workmen had the right to rest in security upon it and the means provided by law to insure its application to their demands. In other words, *the contract became at once a letter of credit and a security.*

The year before the decision in *Copeland* v. *Manton, supra,* which arose under the act of 1843, our own legislature had passed an act similar to the New York act of 1863, whereby, after sundry provisions with reference to sub-contractors and material men, it provided, in section 3, that "any assignment or transfer by such contractor (*i. e.,* the head contractor) of his contract with or claims arising thereunder against such owner * * * shall "save and be subject to the claims of every such mechanic or other person so performing such work, or furnishing such materials." 68 O. L., 107.

In 1877 the mechanics' lien laws of Ohio were revised and codified, and by section 16 of the act of that year, 74 O. L., 168, a similar provision was made that "Any assignment or transfer by said head contractor of his contract with said owner * * * shall save and be subject to the claim of every laborer, mechanic or sub-contractor or material man who has furnished any labor, material or machinery toward the construction, alteration, removal or repair of any property designated in this act."

This provision was carried into the revised statutes of 1880 as part of section 3203, with the insignificant change of the indeterminate adjective, "any" into the indefinite article "an ;" and it still remains as a part of said section.

Plaintiff admits the force and effect of this provision, but contends that it applies only to assignments or transfers made *after* material has been furnished or labor performed and cannot operate to invalidate assignments or transfers made *before* such materials were furnished or labor performed.

Plaintiff bases this argument on the wording of the section which says that those whose claims are to be saved are every laborer, etc., * * * who *has furnished* any labor, etc., his contention being that this phrase, "who has furnished" indicates an intention on the part of the legislature to limit the class of protected persons. But I am unable to read the section in that way, when I view it in the light of what the old law was, the evils that arose under the old law and the remedy that was sought under the new enactment.

Under the old law all assignments were valid except assignments for creditors, with the result that those whose toil and property went to improving and enriching another man's land were side tracked for the benefit of some outside creditor ; and the words used in designating the assignments that should fall under the ban of the amending statutes, viz., the words "any," and "an" are sufficiently comprehensive to include all assignments of whatever nature or character they be or at whatever time made, unless modified by the words suggested by plaintiff's counsel. But those words, it is clear from an inspection of other provisions of the lien statute, were not intended to designate or fix qualifications of time with reference to the assignments that were to be governed by the act. They are intended as *descriptio personarum,* as a designation of the individuals intended to be covered by the section. It is not every contractor, or sub-contractor, or material man, who is entitled to the benefit of the provisions of the lien law even though his labor or material may go in some degree into another man's building or structure. The labor or materials must be furnished under the conditions specified in either section 3184, or 3198, Revised Statutes, and the phrase relied upon by counsel is evidently intended to do no more than cover the persons provided for in section 3198. To give this section any other interpretation would be to construe away the protection intended by it for sub-contractors and material men. The contract of the head contractor, instead of being "a letter of credit and a security" to the sub-men, would in fact become but "a delusion and a snare." Secret assignments, such as in the New Jersey case, *supra,* would absorb in advance, and before opportunity could come to the sub-contractors to protect themselves under the provision of the statute, all that was intended to be retained for their protection. My judgment is, that the statute intended to preclude all assignments by the head contractor of his contract, irrespective of the nature of the assignments or of the time when made, with reference to the work and

labor performed, or materials furnished by laborers and material men. Having reached this conclusion it follows, in my judgment that the rights of the plaintiff under its assign ment must be subject to the claims of the interpleaded defendants herein, whom the court has found to have fixed their claims in conformity to law.

I have examined carefully the case of *Bullock* v. *Horn,* 44 Ohio St., 420, and *Stark* v. *Simmons,* 54 Ohio St., 435, and find nothing in either case that would, to my mind, necessarily alter the conclusion in this case. *Bullock* v. *Horn* would be, if anything, in harmony with the views I express herein, for it was a case where the court denied the right of the owner to set off a claim against the contractor so as to bar a lien claimed by a laborer under said contractor, when such set off did not grow out of the original contract and was acquired by the owner after the labor of the lienor was obtained although before that the laborer's claim had not been paid.

*Stark* v. *Simmons,* supra, is in effect but an enunciation of the rule that a subcontractor's rights against the owner can be no greater and rise no higher by reason of the statute than the rights which the contractor himself would have against the owner under his contract. In this case, at and before the original contract, the contractor was indebted to the owner in a sum equal or nearly so to the amount to become due under the contract, and the court held that the two claims, as between owner and contractor, compensated each other: there was nothing left for the sublienor to attach a claim to; and the court says that the lien law does not, for the purpose of creating a fund to which they (subcontractors) may resort, enlarge the owner's liability to the contractor, as it may be fixed by the terms of his contract, and by the rules of law relating to the subject. In both these cases, the question arose between the owner and the subcontractor and in no wise was an assignee of the contractor involved.

While I have examined the case of *Hamilton* v. *Stillwaugh,* 11 O. C. C., 182, I have not relied on it as an authority for the conclusion reached by me inasmuch as it is not certain, from the facts set forth in that case, when the assignment therein was made, with reference to the time when the work was done by the subcontractors who took out liens subsequently to such assignment and such liens were given priority. *I have reached my conclusion on an interpretation of the statute as I read it.* The claims allowed herein are:

John Mueller, $1.367.56, interest from Jan-

uary 19, 1899. Lien effective from January 19, 1899.

Henry J. Kemp, $342.80, interest from January 22, 1899. Lien effective January 22, 1899.

George H. Bruns, $5,158.06, with interest on $2,384.50 from July 29, 1898, and on $2,773.50 from April 8, 1899. Lien effective January 25, 1899.

F. F. McClure, $796.69, interest from Marsh, 1, 1899. Lien effective March 1, 1899.

No opinion is intended to be expressed one way or the other on the constitutionality or implied repeal of the various provisions and sections of the lien law of 1894, it not being necessary to the decision of this case.

The one doubt I have in this decision is as to the allowance for the 55,000 brick permitted to be included in Bruns' claim. I have not been able to find an authority on the point which squarely meets it, and the only principle that I find is the doctrine of good faith in the delivery, enunciated in *Beckel* v. *Petticrew,* supra. Possibly counsel may be more successful.

A decree may be taken in accordance with this opinion.